UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LATISHA JOHNSON,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>VILLA HEALTHCARE MANAGEMENT,<br>INC.,<br><br>　　　　　Defendants. | No. 21 CV 3629<br><br>Judge Manish S. Shah |

MEMORANDUM OPINION AND ORDER

Plaintiff Latisha Johnson worked at The Villa at South Holland, a skilled nursing facility, for three months. She sued The Villa, and other defendants, for not paying her overtime wages, alleging that defendant violated the Fair Labor Standards Act and the Illinois Minimum Wage Law. Defendants move for summary judgment, claiming Johnson was an executive employee exempt from FLSA's overtime requirements. Defendants' motion, [34], is granted.

## I.　Legal Standard

Summary judgment is proper when there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). I construe all facts and reasonable inferences in favor of Johnson, the nonmoving party. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020). But the defendants are entitled to summary judgment if plaintiff fails to make "a sufficient showing on an essential element" of her case for which she has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.    Local Rule 56.1 and Evidentiary Issues

Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). The rule requires the moving party to file a statement of facts that demonstrates its entitlement to judgment as a matter of law. *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); N.D. Ill. Local R. 56.1(a)(3). The nonmoving party must file a response to that statement and may provide a separate statement of additional facts. *Petty*, 754 F.3d at 420; N.D. Ill. Local R. 56.1(b)(3). Both statements of facts and statements of additional facts must consist of concise numbered paragraphs, supported by citations to specific pages in the evidentiary record. *See* N.D. Ill. Local R. 56.1(d)(1)–(2). Evidence supporting or opposing summary judgment must be admissible if offered at trial, although depositions and other written testimony can substitute for live testimony. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014).

Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). If the responding party disagrees with the other party's fact, it must cite specific parts of the record disputing the fact and "concisely explain how the cited material controverts the asserted fact." N.D. Ill. Local R. 56.1(e)(3). Facts that a party raises in a Local Rule 56.1 response that do not controvert the asserted fact, and that are not included in the party's statement of additional facts, are stricken. N.D. Ill. Local R. 56.1(e)(2). So are facts that are supported only by inadmissible evidence, provided the opposing party objects on that basis. *Widmar*, 772 F.3d at 460.

Johnson did not abide by Local Rule 56.1 in her response to defendants' statement of facts—she never once cites to specific parts of the record. *See* [39].[1] This isn't fatal in every instance; if plaintiff's objection to one of defendants' material facts was later supported by a citation to the record in plaintiff's statement of additional material facts, [41], I consider that fact disputed.[2] But when plaintiff's statement of additional material facts provides nothing to buttress her objections to defendants' statement of facts, I consider defendants' fact admitted.

## III.  Facts

Johnson worked as a full-time employee at The Villa at South Holland, a skilled nursing facility, from May 2019 to July 2019. [39] ¶¶ 1, 2. She was employed as an LPN (Licensed Practical Nurse) Unit Manager. [39] ¶ 4. Her salary was $68,640, or $2,640 every two weeks. [39] ¶ 22.[3]

The parties agree that, as unit manager on the building's third floor, Johnson supervised six to seven employees each shift—two nurses and four to five Certified Nursing Aids. [39] ¶ 7. But they differ on what, exactly, went into that supervision.

---

[1] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from plaintiff's response to defendants' Local Rule 56.1 statement of material facts, [39], and defendants' response to plaintiff's statement of additional material facts, [41], where both the asserted fact and the opposing party's response are set forth in one document. Where material facts are disputed, and the cited exhibits do not directly contradict Johnson's version of the facts, I include the facts in the light favorable to Johnson.

[2] There are only four instances of this: paragraphs 5, 6, 9, and 12 of defendants' statement of material facts. [39]. I consider those facts disputed because plaintiff provided supporting evidence for her objections in her statement of additional material facts.

[3] Johnson's pay varied week by week, depending on whether she picked up extra shifts as a nurse, took unpaid time off, or started or left the job halfway through the pay period. [39] ¶¶ 28–34.

3

The job description for LPN Unit Manager, which was in Johnson's personnel file, provides one picture. [39] ¶¶ 5–6.⁴ According to the description, Johnson's supervisory duties included: "making daily work assignments for non-exempt hourly employees," "directing the work of such non-exempt hourly employees," "preparing written evaluations of assigned employees," "enforcing facility policies with authority to issue Disciplinary Action Reports as needed," the "authority to suspend employees for rule violations," "receiving and handling employee complaints," and "making written or oral reports or recommendations to the Director of Nursing and Administrator concerning nursing program services as warranted by audit/quality monitoring results." [39] ¶ 6 (citing [36-1] ¶ 8; [36-1] at 24–26; [36-2] ¶ 4; [36-2] at 8–10). Defendants say that description accurately reflects what Johnson did. [39] ¶ 6.

Johnson disagrees. She admits that the job description lists those duties, but disputes that it's accurate. [39] ¶ 6. In her response to defendants' statement of material facts, she does not elaborate on why the description is inaccurate. In her statement of additional facts, she says the description "overstates the amount of authority that [she] actually had," and doesn't mention the director and assistant director, who "had to approve essentially all non-clinical decisions" plaintiff made.

---

⁴ Johnson disputes that the job description was in her personnel file. [39] ¶ 5. She doesn't support this with a citation. In her statement of additional facts, she says, "On August 16, 2022, Plaintiff reviewed the LPN Unit Manager Job Description…To the best of Plaintiff's knowledge and recollection, this was her first time ever seeing the Job Description." [41] ¶ 8. To the extent this is supposed to rebut defendants' assertion that the job description was in Johnson's personnel file, it's not responsive. The description could have been in her personnel file without her seeing it. What's more, whether or not she saw the description is immaterial, as defendants note. [41] ¶ 8. The relevant questions are what Johnson's job duties were and what she spent her time doing—not whether she knew what was expected of her.

4

[41] ¶ 9. She also says that the description is inaccurate because it "understates the amount of nursing duties" she had. [41] ¶ 10. Without more detail about how the description overstates and understates her duties, though, plaintiff's statements are too vague to be responsive.[5]

Plaintiff admits that she did the following things in her unit manager role. She trained the nurses and nursing aids she supervised on The Villa's clinical and administrative practices and procedures. [39] ¶ 11. At least once, she guided managers on how to correctly document administrative records and directed them on the type of resident care they were supposed to supervise. [39] ¶ 15. She attended three meetings a day with managers, two in the morning and one in the afternoon. [39] ¶ 16.[6] The first meeting was with the two other LPN Unit Managers, the director, the assistant director, and other management-level employees. [39] ¶ 17. The three unit managers used the first meeting, which usually lasted between 15 and 30 minutes, to report on resident care updates from the past 24 hours. [39] ¶ 17. At the second meeting, which usually lasted an hour, unit managers reviewed newly admitted residents' clinical charts and medical records to ensure they understood

---

[5] Defendants also note that the job description "expressly state[d] that her job was an exempt position." [39] ¶ 5. Because plaintiff didn't object to this, it is admitted. Still, I don't consider this in the legal analysis because it's irrelevant. *See* 29 C.F.R. § 541.2 ("The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part"—i.e., not determined by the job's label.)

[6] Plaintiff admits that she attended meetings but "disputes the remaining facts" of defendants' statement (which reads, "Every day, Johnson attended three meetings involving only other management level employees. She attended two of these meetings in the morning and one in the afternoon."). [39] ¶ 16. Plaintiff doesn't cite to any evidence to support her dispute, nor does she say anything about the meetings in her additional statement of facts. The statement is therefore admitted.

each new resident's condition and could direct the nurses and nursing aids on how to treat them. [39] ¶ 18.[7] At the third, afternoon meeting, which typically lasted 10 to 15 minutes, unit managers shared an overview of their units' completed tasks for the day and any outstanding tasks that remained. [39] ¶ 19.

Johnson also put together draft schedules for the nurses on her floor, which could only be posted after the director signed off on them. [41] ¶ 15.[8] Johnson also had the authority to discipline the nurses and nursing aids she supervised for performance issues like noncooperation, failing to follow correct procedures during resident care, or failing to show for work, though the director had to approve any disciplinary measures. [39] ¶ 13; [41] ¶ 20.[9] Johnson exercised her disciplinary authority on several occasions. [39] ¶ 13. Johnson did not have the authority to approve or deny overtime requests. [41] ¶ 16; [39] ¶ 12.[10] Nor did she have the authority to set rates of pay for her employees. [41] ¶ 17.

---

[7] Plaintiff again admits some of these facts and disputes others, but provides no citation, so they are deemed admitted. [39] ¶ 18.

[8] Defendants object to this sign-off assertion as immaterial. [41] ¶ 15. I disagree. "[R]elative freedom from direct supervision" is one of the factors that determines whether management is an employee's primary duty. 29 C.F.R. § 541.700(a). Whether plaintiff could post the schedule without approval from someone else is material to that factor.

[9] Plaintiff disputes defendants' assertion that she had the authority to discipline employees. She provides no citation to evidence. Further, her own statement about disciplinary measures in her statement of additional material facts doesn't directly contradict defendants' statement. *See* [41] ¶ 20. There, plaintiff says, "Any disciplinary measures for any of the nurses on my floor had to be approved by the [director]. and such disciplinary measures were made in accordance with company [] policy established at the corporate level." [41] ¶ 20. The fact that the director had to approve Johnson's disciplinary actions doesn't mean that Johnson lacked the authority to discipline.

[10] Defendants dispute this. They say Johnson had the authority to approve or deny overtime requests and the authority to ask off-duty employees to come to work to fill any absences as necessary. [39] ¶ 12. Johnson successfully disputes that. In her statement of additional facts,

The parties disagree about how important the agreed-upon managerial duties were to Johnson's job. Specifically, they disagree about how much time she spent on exempt work, how important that work was, whether she was relatively free from supervision while doing it, and how her salary compared to nonexempt employees' wages.

Johnson worked a total of 576 hours in her time at The Villa. [39] ¶ 23. She worked 96 of those hours (twelve eight-hour shifts) as a Licensed Practical Nurse. [39] ¶ 23. The rest of her time was spent as LPN Unit Manager. [39] ¶ 23.[11] In other words, she spent at least 96 hours working in a direct-care, nonexempt capacity. Reading the facts in favor of Johnson at this stage, she spent additional hours on direct care during every Unit Manager shift. She visited every patient on the floor and cared for their medical needs—toileting, bathing, dressing, and feeding them; handing out water; making beds; working the wound care cart; taking vitals; monitoring residents in the dining hall; and speaking with patients and their family members to assess needs and deliver medical care. [41] ¶ 11.[12] On every shift, she

---

she cites to a portion of her declaration where she says she lacked authority to approve or deny overtime requests. [41] ¶ 16. She is competent to describe her authority. But Johnson doesn't provide evidence to counter defendants' assertion that she could ask off-duty employees to come in, so that fact is deemed admitted.

[11] Plaintiff disputes this, but doesn't provide any evidence, either in response to defendants' statement of facts or in her own statement of additional material facts.

[12] According to two nurses, plaintiff sat in her office the vast majority of the time when she wasn't in meetings. [41] ¶ 11 (citing [41-2] ¶ 5; [41-3] ¶¶ 5–7). These nurses never saw plaintiff perform patient-care tasks, with the exception of monitoring residents in the dining hall and speaking with patients or their family members. [41] ¶ 11 (citing [41-2] ¶¶ 6–7; [41-3] ¶¶ 8–9). The fact that these nurses didn't see Johnson doing other patient-care tasks doesn't mean Johnson wasn't doing them at times the nurses weren't observing her. The

also had to perform general housekeeping and janitorial duties, like cleaning patient rooms. [41] ¶ 14.[13] In addition to that, she had to come in once a week at 5 a.m. for direct patient care—performing "skin care sweeps," which involved making a round of the floor to check and treat patient skin conditions. [41] ¶ 1.[14] While Johnson was caring for patients, she wasn't able to simultaneously supervise employees. [41] ¶ 12. That's not to say that all of plaintiff's time was spent on frontline care. With the three daily meetings, she spent on average at least one hour and 25 minutes to one hour and 45 minutes every day in management meetings. *See* [39] ¶¶ 16–19. Still, had Johnson neglected her patient-care duties, it would have had an adverse effect on the health, safety, and wellness of The Villa's patients and could have led to serious bodily harm or even death. [41] ¶ 13.[15]

The parties disagree about whether Johnson was relatively free from supervision during her exempt work. [39] ¶ 9. Defendants say she oversaw the nurses and nursing aids on her floor and made sure they completed their duties without a

---

nurses' testimony creates a dispute over the amount of time Johnson spent on direct patient care.

[13] Defendants cite to a declaration from an employee who says plaintiff wasn't required to perform general housekeeping or janitorial duties because the facility employed a team of housekeeping staff dedicated to those tasks. [41] ¶ 14 (citing [41-1] ¶ 7). I accept plaintiff's telling at this stage.

[14] Defendants object to this assertion as immaterial. [41] ¶ 1. It is material because it speaks to how much time Johnson spent on nonexempt work. Defendants also object that "[p]laintiff fails to state the relevant and material fact that skin care sweeps were a required part of the job for all LPN Unit Managers and that only LPN Unit Managers were required to perform this activity." [41] ¶ 1. But assigning nonexempt work (assuming that skin care sweeps are nonexempt) to otherwise exempt employees doesn't make the work exempt.

[15] Defendants dispute that direct patient care was an important part of Johnson's job because they say she didn't do direct patient care at all. [41] ¶ 13. I credit plaintiff's telling at this stage.

direct supervisor monitoring her. [39] ¶ 9. They cite to declarations from two nurses who worked with Johnson. [36-3] ¶¶ 1–2; [36-4] ¶ 1–2. Those nurses said they "observed her—without a direct supervisor monitoring her as she worked—ensuring that the nurses and [nursing aids] she oversaw rendered services to the residents according to their [resident/patient] care plans, that the nurses and [nursing assistants] met [the proper/Villa's] resident care standards, and that they timely completed resident care documentation requirements in accordance with Medicare and Medicaid regulatory requirements and Villa's policies." [36-3] ¶ 3; [36-4] ¶ 3.

Johnson admits that there was no direct supervisor there when she was training the nurses and nursing aids. [39] ¶ 11. But otherwise, she paints a different picture. She says the director and assistant director were generally expected to be at the facility directly supervising Johnson's work from 8:00 a.m. to 4:30 p.m. (Johnson's work hours when she didn't come in early or leave late). [41] ¶ 4. She also says the director and assistant director "had to approve essentially all non-clinical decisions" that she made. [41] ¶ 9.[16] The assistant director was the "go-to person for all day-to-day managerial decisions," and "serve[d] as a buffer" between the nurses and the director. [41] ¶ 5.[17] If a nurse called off, for instance, the assistant director was

---

[16] Defendants dispute this. They say plaintiff already conceded, in her responses to defendants' statement of material facts, that she had certain supervisory responsibilities. [41] ¶ 9. In fact, plaintiff admitted that the job description listed those supervisory responsibilities, but disputed that the description accurately described what she did. [39] ¶ 6. She reiterates that in her statement of additional facts and cites to her declaration. [41] ¶¶ 9–10 (citing [41-1] ¶¶ 13–14). More to the point, almost none of the supervisory responsibilities defendants point to precludes close supervision of the supervisor (Johnson).

[17] Plaintiff's exact statement is: "Plaintiff *understood* that the [assistant director's] role was to serve as a buffer between the nurses and the [director.]" [41] ¶ 5 (emphasis added).

responsible for ensuring that the staffing shortage was covered. [41] ¶ 5.[18] The director was responsible for "more significant managerial decisions." [41] ¶ 6. For instance, he had to sign off on every schedule that plaintiff drafted before it was posted and had to approve any disciplinary measures Johnson wanted to take. [41] ¶¶ 15, 20.

Johnson was also responsible for interviewing nursing and nursing-aid candidates. [39] ¶ 14. The facility administrator, the director of nursing, and the human resources administrator often followed unit managers' recommendations in making hiring and firing decisions. [39] ¶ 14. Plaintiff admits that she "occasionally interviewed" candidates. [39] ¶ 14. But in her statement of additional facts, she seems to attempt to rebut defendants' assertions about her role in hiring. She says that the director and sometimes the assistant director were active in the hiring process for the candidates who plaintiff interviewed, the director had to approve any candidate hires, and Johnson lacked the ultimate authority to fire employees. [41] ¶¶ 18–19. Those statements don't rebut defendants' assertions, nor do defendants dispute them. It's

---

Defendant objects to this statement "because Plaintiff's understanding of the [assistant director's] role is immaterial to the summary judgment motion." [41] ¶ 5. But Johnson's comments about what she understood the administrators' roles to be are just another way of saying what she observed about their roles, which is relevant.

Defendants also dispute that the assistant director's role was to serve as a buffer between the director and all of the facility's nurses. The assistant director, defendants say, managed the second floor. She therefore served as a buffer only for second-floor nurses and made day-to-day managerial decisions only for that floor. [41] ¶ 5. At this stage, where the non-movant's version of facts is supported by at least some evidence, I read the facts in the light most favorable to her.

[18] Johnson admitted that she had the authority to call in off-duty employees by not properly disputing that fact. *See* supra, n.10. Whether it was her responsibility to do that is a different matter.

possible that all those things were true at the same time: Johnson was responsible for interviewing candidates, managers relied on her recommendations, managers were active in the hiring process, and the director had to approve hires and fires. [41] ¶ 18.

Two years after she left, Johnson sued The Villa for violations of the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1), and the Illinois Minimum Wage Law, 820 ILCS 105/4a. [17]. She also sued Villa Healthcare Management, Inc., of which The Villa of South Holland is a wholly owned subsidiary, as well as thirty-three other Villa entities in different locations. [17].

Defendants moved to dismiss. [16]. That motion was terminated as moot after plaintiff filed an amended complaint. [17]; [19]. After more discovery, defendants moved for judgment on the pleadings. [21]. They made two arguments: 1) Johnson was an executive exempt from FLSA and IMWL's overtime requirements, and 2) none of the defendants except The Villa at South Holland was involved in Johnson's employment. [22]. I denied the motion via oral ruling. [30]. The parties agreed to bifurcate discovery and focus only on whether Johnson was an exempt employee under FLSA. Defendants now move for summary judgment on whether Johnson was an exempt employee. [34].

## IV.  Analysis

Under the Fair Labor Standards Act, an employer must pay an employee at least 1.5 times their regular rate for any time the employee spends working more than 40 hours a week. 29 U.S.C. § 207(a)(1). That rule does not apply to employees in a "bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1).

An executive employee is someone 1) who is paid on a salary basis of not less than $684 per week, 2) whose primary duty is management, 3) who regularly directs the work of at least two other employees, and 4) who has the authority to hire or fire, or whose recommendations about hiring, firing, or promotion are given "particular weight." 29 C.F.R. § 541.100(a). It is the employer's burden to establish that an employee is an executive. *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974)). The Illinois Minimum Wage Law also requires employers to pay at least 1.5 times a nonexempt employee's regular rate for any time the employee works more than 40 hours per week. *See* 820 ILCS 105/4a(1). The Law expressly incorporates the FLSA exemption regulations that were in effect March 30, 2003. 820 ILCS 105/4a(2)(E). Those exemption requirements are different from the ones in effect today but in ways not relevant here. *See* 68 F.R. 15564 (Mar. 31, 2003) (summarizing the "long" and "short" duties tests, the latter of which doesn't include two exemption criteria in effect today). Plaintiff's FLSA and state-law claims therefore rise and fall together. *See Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 376 (7th Cir. 2005).

Johnson concedes that she regularly directed the work of six to seven other employees, [39] ¶ 7, and therefore fulfills one of the exemption criteria. She disputes that she fulfills the remaining three criteria.

### A.    Paid on a Salary Basis

An employee must be compensated on a salary basis of not less than $684 per week to qualify as an executive employee. 29 C.F.R. § 541.600(a). Compensation on a salary basis means that an employee receives, on a weekly or less frequent basis, a

12

predetermined amount that isn't subject to reduction because of variations in the employee's quality or quantity of work. 29 C.F.R. § 541.602(a). There are certain exceptions. For instance, deductions can be made when an exempt employee is absent from work for one or more full days for personal reasons. 29 C.F.R. § 541.602(b)(1). An employer is also not required to pay an employee's full salary in the first or last week of employment but can instead pro-rate the employee's wages. 29 C.F.R. § 541.602(b)(6).

The parties agree that Johnson's total pay varied from pay period to pay period. While that variation might usually suggest that an employee isn't salaried, defendants explain that the variations were due to one of the above exceptions or to Johnson picking up nursing shifts. [39] ¶¶ 26–35. Johnson disputes all these explanations in her response to defendants' statement of material facts, but she cites to nothing in support. Nor does she say anything about the variations in pay in her additional statement of facts. Defendants' explanations for the variations, detailed below, are therefore deemed admitted.

Johnson received seven paychecks during her time at The Villa. [39] ¶ 28. Her salary for each two-week pay period was $2,640. [39] ¶ 27. For each nursing shift she picked up, she also received a $250 bonus. [39] ¶¶ 25–26. Her first paycheck totaled $2,112, instead of the full $2,640, because she began working after the pay period began. [39] ¶ 28. Her second paycheck was $3,154 because the payroll system belatedly processed her $250 bonus for a nursing shift she picked up in the prior pay period. [39] ¶ 29. The Villa also accidentally paid Johnson an additional $264 but

chose not to recoup the money. [39] ¶ 29. Johnson's third paycheck was $3,140. [39] ¶ 30. It included $500 from two nursing shifts she picked up. [29] ¶ 30. The same was true of her fourth paycheck, which also totaled $3,140. [39] ¶ 31. She received $2,348.79 for her fifth paycheck. [39] ¶ 32. That included $500 for two nursing shifts, but didn't include compensation for three days, which she took off as unpaid time off because she hadn't yet earned any vacation days. [39] ¶ 32. Her sixth paycheck was $3,890.79 and included $1,250 from five nursing shifts. [39] ¶ 33. Her seventh and last paycheck totaled $1,320 because she stopped working five days into the pay period. [39] ¶ 34.

None of these variations in pay turned Johnson into a non-salaried worker. The variations attributable to taking unpaid time off and starting and quitting halfway through a pay period both fall within exceptions to the salary-basis definition. *See* 29 C.F.R. § 541.602(b)(1), (6). The variations attributable to picking up extra shifts didn't change Johnson's salaried status because defendants paid her bonuses for each shift, as allowed by FLSA regulations. 29 C.F.R. § 541.604(a) ("An employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis."). Johnson therefore fulfilled the salary-basis criterion for exemption.

### B. Authority to Hire and Fire

To be exempt, an employee must have the authority to hire or fire, or their suggestions about "hiring, firing, advancement, promotion or any other change of

status" must be given "particular weight." 29 C.F.R. § 541.100(a)(4). To decide whether an employee's recommendations are given "particular weight," I look to a number of factors: whether the employee's job duties include making suggestions and recommendations about hiring and firing, how frequently the employee's input is requested, how frequently she gives that input, and how frequently that input is relied on. 29 C.F.R. § 541.105. An employee's input can have "particular weight" even if a higher-level manager's recommendation is more important and even if the employee doesn't have the ultimate authority to make the hiring or firing decision. *Id.* The same is true even if the employee lacks the authority to make a final decision. *Id.*

Johnson was responsible for interviewing candidates, and upper-level managers often followed her recommendations about hiring and firing. [39] ¶ 14. It's true that the director had to approve hires and fires, and that managers were actively involved in the process. But that just means that Johnson's opinions were given "particular weight," as opposed to her having complete authority. That's enough for her to meet this criterion.

### C. Primary Duty

An employee's "primary duty" is their "principal, main, major or most important duty." 29 C.F.R. § 541.700(a). Whether exempt work is an employee's primary duty depends on all the facts in a particular case, "with the major emphasis on the character of the employee's job as a whole." *Id.* Relevant factors include: the employee's relative freedom from direct supervision, the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt

15

work performed by the employee, the relative importance of the exempt duties compared to nonexempt duties, and the amount of time spent on exempt work. *Id.* Though time alone is not the sole test, it can be a particularly useful guide. "[E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." 29 C.F.R. § 541.700(b). Still, not spending more than 50 percent of time performing exempt work doesn't preclude a finding that exempt work is an employee's primary duty. *Id.*

### 1. *Relative Freedom from Supervision*

The parties offer countervailing evidence on this issue. Drawing inferences in favor of the nonmovant, Johnson, the director and assistant director were generally required to directly supervise her from 8:00 a.m. to 4:30 p.m. [41] ¶ 4. But Johnson marshals no specific evidence of the director and assistant director restricting her conduct, other than pointing to their general presence and availability as supervisors. Johnson enjoyed freedom from supervision when she trained nurses and supervised other nurses' compliance with facility standards. She asserts that non-clinical decisions were subject to approval, leaving all clinical decisions relatively free from supervision. And as compared to other nurses on the floor, Johnson operated with more freedom. Middle managers will necessarily have supervisors above them, and the record here leaves no doubt that Johnson functioned as a middle manager with some discretionary authority subject to supervisory review.

2. *How Johnson's Salary Compared to Nonexempt Employees'
Wages*

Johnson's salary was $68,640, or $2,640 every two weeks. [39] ¶ 22. Assuming a 40-hour workweek, and excluding the extra shifts she picked up, she made $33 per hour. [39] ¶ 22. The nurses and nursing aids Johnson managed made between $27 and $28 per hour, in comparison. [39] ¶ 22.[19] The regulations don't provide guidance on how large a pay difference has to be for this factor to cut in defendants' favor, but at least one circuit has said that a $6 per hour difference is enough. *See In re Family Dollar FLSA Litig.*, 637 F.3d 508, 517 (4th Cir. 2011) ($3.81 to $6.21 per hour difference between plaintiff and other employees' wages cut in favor of employer's argument that plaintiff's primary duty was management); *see also In re Family Dollar FLSA Litig.*, 988 F. Supp. 2d 567, 576 (W.D.N.C. 2013) ($3.02 to $3.36 hourly difference between nonexempt employees and plaintiff cut in employer's favor); *compare Jackson v. Go-Tane Servs., Inc.*, 56 Fed. App'x 267, 271 (7th Cir. 2003) ($0.66 difference was insufficient).

The $5 to $6.17 per hour difference between Johnson's salary and the hourly rate of those she supervised is in line with the difference in *In re Family Dollar FLSA Litigation*, where the Fourth Circuit said the difference cut against plaintiff's argument. 637 F.3d at 517. The magnitude of difference here similarly suggests Johnson had different and more senior job duties than employees classified as nonexempt workers.

---

[19] Johnson disputes defendants' assertions about pay rates but doesn't elaborate and doesn't provide citations to evidence. [39] ¶ 22.

### 3. *Relative Importance of Exempt v. Nonexempt Work*

Johnson says that the nonexempt work she did was very important: had she not performed those duties, it would have had an adverse effect on the wellness of patients and could have led to serious bodily harm or even death to a patient. But Johnson does not explain how her management of other nurses, and their patient care, would not also have advanced patient welfare. Her managerial responsibilities—supervising other nurses and attending management meetings to address patient care, provide daily updates on outstanding issues from the previous day, and flag issues for the next day—were just as important, if not more, to defendants' overall operations.

### 4. *Amount of Time Spent on Exempt v. Nonexempt Work*

The parties disagree about what percentage of time Johnson spent on nonexempt work, in large part because they disagree about what Johnson's total hours are for purposes of the legal analysis. Plaintiff says the total-hours denominator is 576 hours, which includes Johnson's unit-manager work and the nursing shifts she picked up. *See* [38] at 8. Johnson therefore spent at least 17 percent of her time (96 divided by 576) doing nonexempt work, plaintiff says, so a trier of fact would only need to find that she spent another 34 percent of her time doing nonexempt work to find that her primary duty was not management. [38] at 8.

Defendants say that the 96 hours she worked as a nurse are irrelevant because "the only position for which Johnson's exemption status is at issue is her role as [a unit manager]." [40] ¶ 9. The nursing job, they say, is a "separate, non-exempt" job, so the total-hour denominator is 480 hours. *See* [40] ¶ 9.

18

The nursing shifts were not part of Johnson's role as unit manager—she chose to work those extra shifts. It would make no sense to let optional shifts affect the exemption status of the job she was actually brought on to do. The total number of hours for purposes of the exemption determination is 480.

The parties also disagree about whether Johnson did any direct patient care on her unit-manager shifts. [41] ¶¶ 11, 14. Defendants say I shouldn't credit plaintiff's account because she hasn't provided "even a shred of evidence" about the amount of time she spent performing non-managerial tasks. [40] at 7. Defendants cite to *Langston v. Lookout Mountain Community Services*, 775 Fed. App'x 991 (11th Cir. 2019), to argue that plaintiff had to provide more detail about how much time she spent on nonexempt work. [40] at 7. That (out-of-circuit, nonprecedential) case is inapposite. The plaintiff in *Langston* testified that "she helped prepare food for the patient only when the instructors were busy, would assist the nurses with counting medication only when they asked for help, and would change the patient's clothes only when needed." 775 Fed. App'x at 998. Johnson provides more: in addition to the weekly three hours of nonexempt work spent on skin care sweeps, she says she did nonexempt work every day she was working—not just on an as-needed basis. [41] ¶¶ 1, 11, 14.

Defendants also say I shouldn't credit plaintiff's account because of countervailing evidence. [40] at 7. In their response to plaintiff's statement of additional facts, they cite to declarations from nurses who worked for Johnson. [41] ¶ 11. Both nurses say it was their responsibility, together with the nursing aids, to

19

perform *all* the direct patient care in Johnson's unit. [41-2] ¶ 4; [41-3] ¶ 4 (emphasis added). They say they never saw Johnson perform direct patient care, except for monitoring residents in the dining hall and occasionally speaking with patients or their family members. [41-2] ¶¶ 6–7; [41-3] ¶¶ 8–9. They say they sometimes sat at the nurses' station on the third floor, which was centrally located and located next to Johnson's office. [41-2] ¶ 5; [41-3] ¶¶ 5–6. Because they worked close to Johnson, they were able to observe her frequently. [41-2] ¶ 5; [41-3] ¶ 6. They say Johnson spent the vast majority of the time they were sitting at the nurses' station in her office. [41-2] ¶ 5; [41-3] ¶ 7.[20]

Johnson's statements call those observations into question. She says that she performed direct patient care every single shift, including three hours every Wednesday, before the regular 8 a.m. start time. [41] ¶¶ 1, 11, 14. It's possible the nurses never saw Johnson perform direct patient care because they weren't in the rooms Johnson was in. It's also possible that only "sometimes" sitting at the nurses' station, as opposed to always, kept them from seeing the many times Johnson was allegedly away from her desk and administering care.

Johnson has properly disputed defendants' assertion that she did no nonexempt, direct patient-care work, so for purposes of summary judgment, she

---

[20] One of the nurse's statements reads: "I sometimes sat at the nurses' station on the third floor, which was centrally located and located next to Ms. Johnson's office. Because we worked in such close proximity to each other, I was able to observe Ms. Johnson frequently when she worked as an LPN Unit Manager (excluding the time she spent in managers' meetings). She spent the vast majority of her time as an LPN Unit Manager in her office." [41-2] ¶ 5. I read the record in the light most favorable to Johnson and assume that the nurse's observation of Johnson occurred only when she "sometimes" sat at the nurses' station.

performed some nonexempt work. But even looking at the facts favorably to Johnson, there is no evidence that she spent the majority of her time on nonexempt work. Johnson spent at least three hours (7.5% of a 40-hour week) doing nonexempt wound care. She spent at least an hour and 25 minutes every day (17.7%) in managerial meetings. The parties have not calculated the remainder of her 40 hours, roughly 75% of her time, with any specificity. That time included some nonexempt patient-care or janitorial work, but also included time on management: time in her office (drafting work schedules, for example), time training nurses, time guiding other managers on proper documentation and resident care, and time exercising her disciplinary authority.

Although the number of hours spent on nonexempt work is unclear, there is no material dispute that Johnson's primary duty was management. She enjoyed relative freedom from supervision, she was paid more than frontline nurses, her management tasks were important, and she necessarily spent a significant amount of time fulfilling her management responsibilities.

* * *

Johnson regularly directed the work of at least two other employees, was paid a salary greater than $684 per week, weighed in on hiring decisions, and her primary duty was management. She was exempt from federal and state overtime pay requirements.

21

## V.     Conclusion

The motion for summary judgment, [34], is granted. Enter judgment in favor of defendants and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: February 28, 2022

22